Suzanne Adler #1612113
Landye Bennett Blumstein LLP
701 W 8th Ave., Suite 1100
Anchorage, Alaska 99501
Telephone: (907) 223-4316
Email: suzannea@lbblawyers.com

*Attorneys for Plaintiff Baxter Senior Living, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BAXTER SENIOR LIVING, LLC,<br>an Alaska limited liability company,<br><br>Plaintiff,<br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br>an Illinois corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 3:22-cv-00044-SLG

## **<u>FOURTH JOINT STATUS REPORT</u>**

The Parties, by and through their undersigned counsel, hereby file this *Fourth Joint Status Report*. This Report is required by the Court's April 16, 2024 order, requiring a status report be filed by September 30, 2024 or within 14 days of the Alaska Supreme's Court's decision regarding the certified questions submitted to that court.

1.      On November 8, 2023, the Alaska Supreme Court held oral argument on the Court's certified questions.

2.      On September 27, 2024, the Alaska Supreme Court issued its decision in Baxter Senior Living, LLC v. Zurich American Insurance, Co., Supreme Court No. S-18541, which answered both certified questions in the negative.

FOURTH JOINT STATUS REPORT                                    Page 1 of 2
*Baxter Senior Living, LLC v. Zurich American Insurance Co.*, Case No. 3:22-cv-00044-SLG

Case 3:22-cv-00044-SLG    Document 39    Filed 09/30/24    Page 1 of 30

3. A copy of the Alaska Supreme Court opinion and order is attached for the court's convenience.

4. The parties respectfully request that the court schedule a status hearing at its convenience.

DATED at Anchorage, Alaska this 30th day of September, 2024.

LANDYE BENNETT BLUMSTEIN LLP
Attorneys for Plaintiff

By: _/s/Suzanne A. Adler_
      Alaska Bar No. 1612113
      Suzannea@lbblawyers.com

LANE POWELL LLC
Attorneys for Defendant

By: _/s/Michael S. Baylous_
      Alaska Bar No. 0905022
      baylousm@lanepowell.com

I certify that on 9/30/2024 I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Riza Smith, Legal Assistant_

FOURTH JOINT STATUS REPORT                  Page 2 of 2
*Baxter Senior Living, LLC v. Zurich American Insurance Co.*, Case No. 3:22-cv-00044-SLG

*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BAXTER SENIOR LIVING, LLC, | ) |
| | ) Supreme Court No. S-18541 |
| Plaintiff, | ) |
| | ) U.S. District Court No. |
| v. | ) 3:22-CV-00044-SLG |
| | ) |
| ZURICH AMERICAN INSURANCE | ) O P I N I O N |
| CO., | ) |
| | ) No. 7724 – September 27, 2024 |
| Defendant. | ) |
| | ) |

Certified Question from the United States District Court for the District of Alaska, Sharon L. Gleason, District Judge.

Appearances: William M. Bankston, John C. Crone, and Suzanne A. Adler, Bankston Gronning Brecht P.C., Anchorage, for Plaintiff. David M. Schoeggl, Michael B. Baylous, and Erika A. O'Sullivan, Lane Powell LLC, Anchorage, Patrick F. Hofer, Clyde & Co. US LLP, Washington, D.C. Jared K. Clapper, Clyde & Co. US LLP, Chicago, Illinois, for Defendant. Laura A. Foggan, Crowell & Moring LLP, Washington, D.C. and Eva R. Gardner, Ashburn & Mason, P.C., Anchorage, for Amicus Curiae American Property Casualty Insurance Association.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

# I. INTRODUCTION

We accepted two certified questions from the United States District Court for the District of Alaska. The District Court asked: (1) Can the presence of the COVID-19 virus at an insured property constitute "direct physical loss of or damage to" the property for the purposes of an insurance policy; and (2) can operational restrictions imposed on an insured property by COVID-19 pandemic-related governmental orders constitute "direct physical loss of or damage to" the property for the purposes of a commercial insurance policy? Our answer to both questions is "no."

# II. FACTS AND PROCEEDINGS

## A. Facts

Baxter Senior Living, LLC opened an assisted living facility in Anchorage in 2019. It obtained an insurance policy from Zurich American Insurance Company with coverage from September 2019 to September 2020. Among the coverages the policy provided were the following:

> [(1) Property Coverage for Microorganisms, which states:] We will pay the following when 'microorganisms'[1] are the result of a 'covered cause of loss', other than fire or lightning:
>
> a. Direct physical loss of or damage to Covered Property caused by 'microorganisms', including the cost of removal of the 'microorganisms';
>
> b. The reasonable cost to tear out and replace any part of the covered building or other property needed to gain access to the 'microorganisms'; and
>
> c. The reasonable cost of testing performed after removal, repair, replacement, or restoration of the damaged property is completed, provided there is a reason to believe that the 'microorganisms' are still present.

---

[1] "Microorganism" is defined in the policy as "any type or form of organism of microscopic or ultramicroscopic size including, but not limited to, 'fungus', wet or dry rot, virus, algae, or bacteria, or any by-product."

. . .

[(2) Business Income Coverage, which states:]  We will pay for the actual loss of 'business income' you sustain due to the necessary 'suspension'[2] of your 'operations'[3] during the 'period of restoration'.[4]  The 'suspension' must be caused by direct physical loss of or damage to property at a 'premises' at which a Limit of Insurance is shown on the Declarations for Business Income.  The loss or damage must be directly caused by a 'covered cause of loss'.

. . .

[(3) Civil Authority Coverage for Business Income, which states:]  We will pay for the actual loss of 'business income' you sustain for up to the number of days shown on your Declarations for Civil Authority[5] resulting from the necessary 'suspension', or delay in the start, of your 'operations' if the 'suspension' or delay is caused by order of civil authority that prohibits access to the 'premises' or 'reported unscheduled premises'.  That order must result

---

[2]      "Suspension" is defined in the policy as "[t]he slowdown or cessation of . . . business activities," or "[t]hat a part or all of the covered location is rendered untenantable."

[3]      The policy defines "operations" as "business activities occurring at the covered location prior to the physical loss or damage," and that "the covered location is tenantable prior to the physical loss or damage."

[4]      Under the policy a "period of restoration" is "the period of time that begins when . . . [t]he direct physical loss or damage that causes 'suspension' of your 'operations' occurs" and ends on "[t]he date when the location where the loss or damage occurred could have been physically capable of resuming the level of 'operations' which existed prior to the loss or damage, if the location had been restored to the physical size, construction, configuration, location, and material specifications which would satisfy the minimum requirements necessary to obtain all required building permits, occupancy permits, operating licenses, or similar documents."

The policy excludes from the definition "any increased period required due to the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of . . . 'microorganisms'."

[5]      The policy provided Baxter with up to 30 days of coverage.

from a civil authority's response to direct physical loss of or damage to property located within one mile of the 'premises' or 'reported unscheduled premises' which sustains a 'business income' loss. The loss or damage must be directly caused by a 'covered cause of loss'.

. . .

[(4) Microorganisms Coverage for Business Income, which states:] We will pay for the actual loss of 'business income' you sustain due to the:

a.    Necessary 'suspension' of your 'operations' from direct physical loss of or damage to Covered Property caused by 'microorganisms' when the 'microorganisms' are the result of a 'covered cause of loss'; or

b.    Prolonged 'period of restoration' due to the remediation of 'microorganisms' from a covered loss.

. . .

[(5) Extra Expense Coverage, which states:] We will pay for the actual and necessary 'extra expense'[6] you incur due to direct physical loss of or damage to property at a 'premises' at which a Limit of Insurance is shown for Extra Expense on the Declarations. The loss or damage must be directly caused by a 'covered cause of loss'.

. . .

[(6) Civil Authority Coverage for Extra Expense, which states:] We will pay for the actual and necessary 'extra expense' you incur for up to the number of days shown on the Declarations for Civil Authority when an order of civil authority prohibits access to the 'premises' or 'reported unscheduled premises'. That order must result from a civil authority's response to direct physical loss or damage to

---

⁶    The policy defines "extra expense" as "operating expenses you incur during the 'period of restoration' that would not have been necessary to incur if there had been no direct physical loss or damage to the property, provided such expenses are incurred . . . [i]n an attempt to avoid a 'suspension' of or to continue those 'operations' which have been affected by the direct physical loss or damage to the property[] or . . . [i]n an attempt to minimize the 'period of restoration'."

**7724**

property located within one mile from the 'premises' or 'reported unscheduled premises' where the 'extra expense' was incurred. The loss or damage must be directly caused by a 'covered cause of loss'.

. . .

[(7) Communicable Disease Suspension of Operations Coverage for Business Income, which states:] [T]he coverage provided at a 'premises' or 'reported unscheduled premises' will also cover the actual loss of 'business income' you sustain due to an order of an authorized public health official or governmental authority that prevents access to that 'premises' or 'reported unscheduled premises', or a portion of that 'premises' or 'reported unscheduled premises', because of the discovery or suspicion of a communicable disease or threat of the spread of a communicable disease at that 'premises' or 'reported unscheduled premises'.

Sometime in March 2020, in response to the emerging COVID-19 pandemic, the Alaska Department of Health and Social Services (DHSS) sent Centers for Disease Control (CDC) recommendations to owners and operators of assisted living facilities, including Baxter, aimed at protecting "individuals who are at risk for severe illness, . . . includ[ing] the residents of all assisted living homes." Abiding by the recommendations would restrict usual operations at the facilities and require the purchase of additional supplies.[7]

Baxter began limiting access to the facility in March; it refused tours of the facility, reduced residents' access to friends and family, suspended new admissions

---

[7] These recommendations included: (1) social distancing; (2) altering residents' schedules to reduce mixing; (3) daily temperature checks and symptom screening of staff and visitors; (4) requiring staff to wear masks and wash hands before entering and after leaving residents' rooms; (5) limiting outside programs; (6) considering suspension of new admissions; (7) implementing short-term closures for cleaning and contact tracing; (8) implementing longer-term closures or quarantines; (9) suspending visitor access with alternative means of communication for family members; and (10) allowing only limited end-of-life family visits.

and visits to the facility, and instituted strict distancing and hygiene protocols for all residents and staff. Baxter sought, but had difficulty obtaining, personal protective equipment due to shortages. And it incurred additional costs for equipment and other safety measures. Despite these efforts, Baxter staff and residents experienced 44 positive COVID-19 cases by November 2020.

In July 2020 Zurich provided Baxter a Notice of Conditioned Renewal, which stated that the insurance provision governing the suspension of operations resulting from a government response to a threat of the spread of communicable disease would be removed effective September 2020. Coverage for loss of business income under the Communicable Disease Suspension of Operations provision would therefore no longer be available.

In August DHSS issued "COVID-19 Recommended Guidance for Congregate Residential Settings," encouraging operators of residential care facilities like Baxter to "implement measures to ensure overall safety and well-being of all of [their] residents" and consider a number of factors in their evaluations. The document also provided residential care facilities with a three-phased plan to assist in evaluating these factors. If a facility adopted the guidance, the document warned that "the actions contained in that document [would] become mandatory as your facilities requirements." Thus if a facility "fails to meet all the phase criteria and continues to progress to a less stringent phase, the facility may be subject to enforcement action(s)."[8]

In September, prior to the removal of coverage for loss of business income under the Communicable Disease Suspension of Operations provision, Baxter filed a claim with Zurich for loss of business income under that provision. Zurich denied the claim.

---

[8]    *See* 42 C.F.R. §§ 488.402, 488.406, 488.408 (2023) (authorizing Centers for Medicare and Medicaid Services (CMS) and states to impose remedies under 42 C.F.R. § 488.406 for noncompliance found by CMS or state survey agencies).

### B. Proceedings

In February 2022 Baxter filed a complaint alleging seven claims for breach of contract. Six of the seven claims involved coverage for "direct physical loss of or damage to" covered property or extra expenses resulting from "direct physical loss of or damage to" such property.[9] Baxter alleged that the pandemic generally, the presence of the COVID-19 virus at its facility, and DHSS directives and orders relating to the pandemic caused loss of use of its property resulting in its operating at less than full capacity, loss of income, and extra expenses. Baxter also asserted claims for breach of the implied covenant of good faith and fair dealing and tortious insurance bad faith based on Zurich's denial of coverage.

Baxter alleged that "direct physical loss of or damage to" property includes "loss of use of its property" due to the presence of COVID-19 and the various state directives and orders relating to the pandemic. Baxter sought damages for Zurich's alleged breaches of the insurance policy by failing to provide coverage for "loss of use" of property as well as loss of business income and extra expenses due to its loss of use of property.

In March Zurich removed the case to federal court and moved to dismiss it. Zurich argued most of Baxter's claims failed because Baxter did not plausibly allege "direct physical loss of or damage to" property. Zurich argued that "[n]either the mere presence of the COVID-19 virus . . . nor any generalized threat from its presence constitutes the 'direct physical loss of or damage to' " property under the policy. Zurich

---

[9]     Baxter brought claims of breach of contract of the following coverages: (1) Property Coverage for Microorganisms, (2) Business Income Coverage, (3) Civil Authority Coverage for Business Income, (4) Microorganisms Coverage for Business Income, (5) Extra Expense Coverage, (6) Civil Authority Coverage for Extra Expense, and (7) Communicable Disease Suspension of Operations Coverage for Business Income. All these coverages, apart from the Communicable Disease Suspension of Operations Coverage for Business Income, require "direct physical loss of or damage to property."

also argued that Baxter "elected to 'lockdown' its [f]acility." And Zurich separately argued that the Microorganisms Exclusion in the policy precluded coverage because COVID-19 was a "microorganism." The Microorganisms Exclusion provides:

> We will not pay for loss or damage consisting of, directly or indirectly caused by, contributed to, or aggravated by the presence, growth, proliferation, spread, or any activity of "microorganisms", unless resulting from fire or lightning. Such loss or damage is excluded regardless of any other cause or event, including a "mistake", "malfunction", or weather condition, that contributes concurrently or in any sequence to the loss, even if such other cause or event would otherwise be covered.

> But if a result of one of these excluded causes of loss is a "specified cause of loss", other than fire or lightning, we will pay that portion of the loss or damage which was solely caused by that "specified cause of loss".

> We will also not pay for loss, cost, or expense arising out of any request, demand, order, or statutory or regulatory requirement that requires any insured or others to test for, monitor, clean up, remove, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of "microorganisms".

In its motion to dismiss Zurich argued that the provision insuring losses from microorganisms only applied when microorganisms were the *result* of a covered cause of loss, not when they were the *cause* of the loss itself, as Baxter claimed. Zurich also argued that the Communicable Disease Suspension of Operations provision did not apply because no public health official or governmental authority prevented access to Baxter's premises. Finally, Zurich argued that it did not breach the implied covenant of good faith and fair dealing and did not engage in tortious insurance bad faith because its denial of coverage was based on a reasonable policy interpretation.

Baxter opposed the motion to dismiss. It argued that "direct physical loss of or damage to" property does not require "physical damage." Baxter also argued its claims under the provision covering losses from communicable diseases and implied

covenant of good faith and fair dealing, and its bad faith claim did not implicate the meaning of the phrase "physical loss of or damage to" property. Baxter finally argued that the Microorganisms Exclusions did not exclude coverage under many of the provisions it relied upon. Zurich replied, maintaining that "physical loss of or damage to" property required tangible physical damage to property.

In September 2022 the United States District Court for the District of Alaska certified two questions of law to this court under Alaska Appellate Rule 407:

> (1) Under Alaska law, can the presence of the COVID-19 virus at an insured property constitute "direct physical loss of or damage to" the property for the purposes of a commercial insurance policy?
>
> (2) Under Alaska law, can operating restrictions imposed on an insured property by COVID-19 pandemic-related governmental orders constitute "direct physical loss of or damage to" the property for the purposes of a commercial insurance policy?[10]

We accepted the questions and allowed amicus briefing from the American Property Casualty Insurance Association (APCIA), the primary national trade association for home, auto, and business insurers.

## III.   STANDARD OF REVIEW

Under Appellate Rule 407(a), we may answer certified questions that "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in [our] decisions." "We exercise our independent judgment when answering a certified question of law

---

[10]    The district court denied Zurich's motion for reconsideration of the order certifying questions.

Case 3:22-cv-00044-SLG    Document 39    Filed 09/30/24    Page 11 of 30

and 'select the rule of law that is most persuasive in light of precedent, reason, and policy.' "[11]

## IV. DISCUSSION

More than two thousand COVID-19 business interruption cases have been filed in American courts since the beginning of the pandemic.[12]  Virtually all of them have been decided against Baxter's position.  A vast majority of federal court decisions have dismissed COVID-19 business interruption claims with prejudice; so too have a majority of state courts ruling on the merits on motions to dismiss.[13]  And nearly all state supreme courts confronted with the question have concluded that the phrase "direct physical loss of or damage to property" does not encompass COVID-19 pandemic-related operating restrictions or the presence of the COVID-19 virus.[14]

---

[11]    *Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 598 (Alaska 2021) (quoting *Kallstrom v. United States*, 43 P.3d 162, 165 (Alaska 2002)).

[12]    *See* COVID COVERAGE LITIGATION TRACKER, https://cclt.law.upenn.edu/ (last visited Sept. 9, 2024) (recording over 2,390 COVID-19 business interruption cases based on "physical loss or damage" language).

[13]    *See Trial Court Rulings on the Merits in Business Interruption Cases*, COVID COVERAGE LITIGATION TRACKER, https://cclt.law.upenn.edu/judicial-rulings/ (last visited Sept. 9, 2024) (noting nearly 86% of merits rulings on motions to dismiss in federal court and over 69% of such rulings in state court have been full dismissals with prejudice).

[14]    *See, e.g.*, *Conn. Dermatology Grp., PC v. Twin City Fire Ins. Co.*, 288 A.3d 187, 199 (Conn. 2023) (concluding record lacks indication of physical transformation of properties as a result of COVID-19 pandemic but instead that "the COVID-19 pandemic caused a transformation in governmental and societal expectations and behavior that had a seriously negative impact on the plaintiffs' businesses"); *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 552-55 (Iowa 2022) (concluding possibility of COVID-19 virus being present on insured's facilities was insufficient to trigger coverage because "mere loss of use of property, without more," was not "direct physical loss of property"); *Cajun Conti LLC v. Certain Underwriters at Lloyd's, London*, 359 So. 3d 922, 926-29 (La. 2023) (concluding COVID-19 did not cause "direct physical loss of or damage to" insured restaurant's

property); *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1060 (Md. 2022) (rejecting insured's argument that "Coronavirus rested on and adhered to surfaces of property at its stores" was direct physical loss or damage because insured "does not allege that any aspect of its property was either lost or structurally altered by its contact with Coronavirus particles"); *Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1275-77 (Mass. 2022) (concluding COVID-19 governmental orders or presence of COVID-19 virus on property was not "direct physical loss of or damage to" property); *Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. Cnty. Clark*, 535 P.3d 254, 263-67 (Nev. 2023) (concluding presence of COVID-19 on property did not amount to "direct physical loss or damage" under insurance policy); *AC Ocean Walk, LLC v. Am. Guarantee & Liab. Ins. Co.*, 307 A.3d 1174, 1185-89 (N.J. 2024) (concluding COVID-19 pandemic, presence of COVID-19 particles on properties, and governmental directives compelling limitations of insured's casino and entertainment operations was not "direct physical loss of or damage to" property because insured was merely "not permitted to use its property as it would otherwise have done"); *Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*, 235 N.E.3d 332, 336-42 (N.Y. 2024) (concluding presence of COVID-19 particles or loss of use due to COVID-19-related government shutdown orders was not "direct physical loss or damage" because there was no physical alteration of property); *Neuro-Commc'n Servs., Inc. v. Cincinnati Ins. Co.*, 219 N.E.3d 907, 915-16 (Ohio 2022) (concluding general presence of COVID-19 in community, presence of COVID-19 on surfaces at premises, and presence of persons infected with COVID-19 on premises, was not "direct physical loss or damage" to property); *Cherokee Nation v. Lexington Ins. Co.*, 521 P.3d 1261, 1264-65, 1268-70 (Okla. 2022) (concluding business interruption losses from temporary closure to prevent COVID-19-related harm was not "direct physical loss or damage to" property); *Sullivan Mgmt., LLC v. Fireman's Fund Ins. Co.*, 879 S.E.2d 742, 745-46 (S.C. 2022) (concluding presence of COVID-19 virus particles does not constitute "physical loss of or damage to" property); *Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 515 P.3d 525, 532-34 (Wash. 2022) (concluding COVID-19 business interruption claim for loss or intended use and loss of business income was not physical loss of property but "more akin to an abstract or intangible loss"); *Colectivo Coffee Roasters, Inc. v. Soc'y Ins.*, 974 N.W.2d 442, 447-48 (Wis. 2022) (concluding presence of COVID-19 did not constitute physical loss of or damage to property because it does not "alter the appearance, shape, color, structure, or other material dimension of the property") (internal quotation marks omitted).

Vermont is the lone state that has allowed claims for COVID-19 business interruption losses to survive a motion to dismiss.[15] But it did so by stretching the "physical alteration" requirement for "direct physical damage" to property to include "alterations at the microscopic level," given Vermont's "extremely liberal" notice-pleading standards.[16]

We see no reason to differ from the overwhelming majority. Even with our insured-friendly approach to interpreting insurance contracts, we conclude that neither the presence of the COVID-19 virus at an insured property nor operating restrictions imposed on an insured property by COVID-19 pandemic-related governmental orders is "direct physical loss of or damage to" property.[17] "Direct physical loss of or damage to" property requires a tangible or material alteration of property.

## A. Alaska's Approach To Insurance Policy Interpretation.

Alaska law treats insurance policies as "sui generis."[18] Insurance policies are "not controlled directly by usual contractual principles," but are treated instead as "contracts of adhesion[19] due to the inequality in bargaining power."[20] Alaska law

---

[15] *Huntington Ingalls Indus. v. Ace Am. Ins. Co.*, 287 A.3d 515, 536-37 (Vt. 2022).

[16] *Id.* at 527-28, 533.

[17] *See Downing v. Country Life Ins. Co.*, 473 P.3d 699, 704 (Alaska 2020) ("We interpret ambiguous insurance policies in favor of the purported insured." (quoting *Dugan v. Atlanta Cas. Cos.*, 113 P.3d 652, 655 (Alaska 2005))).

[18] *Long v. Holland Am. Line Westours, Inc.*, 26 P.3d 430, 444 (Alaska 2001) (Eastaugh, J., dissenting).

[19] Contracts of adhesion are "standard form printed contracts prepared by one party and submitted to the other on a 'take it or leave it' basis." *Stordahl v. Gov't Emps. Ins. Co.*, 564 P.2d 63, 65 n.4 (Alaska 1977) (quoting *Standard Oil Co. of Cal. v. Perkins*, 347 F.2d 379, 383 n.5 (9th Cir. 1965)).

[20] *Weaver Bros. v. Chappel*, 684 P.2d 123, 125 (Alaska 1984).

recognizes that policyholders "are offered a contract on a 'take-it-or-leave-it' basis; premiums are not negotiated but rather are set so as to ensure that the insurer can profit from the relationship."[21] "Because we treat insurance policies as contracts of adhesion, we construe such policies so as to provide that coverage which a layperson would have reasonably expected from a lay interpretation of the policy terms."[22] Thus "the policyholder's 'objectively reasonable expectations' govern, even if 'painstaking study of the policy provisions would have negated those expectations.' "[23]

When interpreting an insurance policy, we look to: "(1) the language of the disputed provisions in the policy, (2) other provisions in the policy, (3) extrinsic evidence, and (4) case law interpreting similar provisions."[24] While we "interpret ambiguous insurance policies in favor of the purported insured," it is well established that "the mere fact that two parties to an insurance contract have differing subjective interpretations of that contract does not make it ambiguous."[25] Ambiguity exists "only when the contract, taken as a whole, is reasonably subject to differing interpretations."[26]

---

[21] *Best v. Fairbanks N. Star Borough*, 493 P.3d 868, 873 (Alaska 2021) (citing *Stordahl*, 564 P.2d at 65 n.4).

[22] *Downing*, 473 P.3d at 704 (internal quotation marks omitted) (quoting *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979)).

[23] *Id.* (quoting *Allstate Ins. Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004)).

[24] *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Houle*, 269 P.3d 654, 657-58 (Alaska 2011)). We do not consider extrinsic evidence in this case because there was none.

[25] *Id.* (quoting *Dugan v. Atlanta Cas. Cos.*, 113 P.3d 652, 655 (Alaska 2005)).

[26] *Id.* (emphasis and internal quotations omitted) (quoting *Dugan*, 113 P.3d at 655).

**B. The Language "Direct Physical Loss Of Or Damage To" Excludes Coverage For The Presence Of COVID-19 On Property Or COVID-19 Pandemic-Related Operating Restrictions Imposed On Property.**

**1. "Direct physical loss" and "direct physical damage" have different meanings.**

We have never previously defined the phrase "direct physical loss of or damage to" property as it appears in insurance policies. The closest we have come to doing so was in *Whispering Creek Condominium Owner Ass'n v. Alaska National Insurance Co.*, where we interpreted the phrase, "risk of direct physical loss involving collapse."[27]

The policy at issue in *Whispering Creek* insured "against risk of direct physical loss involving collapse . . . caused only by . . . hidden decay."[28] The Whispering Creek Condominium Owners Association sued the insurer for costs to repair its condominiums whose "ceilings . . . showed signs of possible collapse" due to rot.[29] We agreed with the association because the complex was "in imminent danger of collapse," and held that the collapse provision covered an imminent danger of collapse.[30]

Baxter argues that the phrase "direct physical loss of or damage to" is "disjunctive" and therefore that "direct physical loss of" must mean something different than "damage to" property. Zurich does not take a position on whether the two phrases "direct physical loss" or "direct physical damage" are disjunctive. APCIA agrees with Baxter that the phrase can be disjunctive, but argues that "physical loss" cannot mean a loss of use of property "unaccompanied by any tangible, physical alteration of property."

---

[27]     774 P.2d 176, 178 (Alaska 1989).

[28]     *Id.*

[29]     *Id.* at 177.

[30]     *Id.* at 180.

The phrase "direct physical loss of or damage to" uses distinct and separate words in "loss" and "damage."  Black's Law Dictionary defines "loss" and "damage" differently:  loss is "an undesirable outcome of a risk; the disappearance or diminution of value, [usually] in an unexpected or relatively unpredictable way" or "the failure to maintain possession of something,"[31] while damage is a "loss or injury to person or property[,] esp[ecially] physical harm that is done to something or to part of someone's body."[32]  Moreover, because one of the two words would be rendered meaningless if identical meanings were given to both, the phrases "loss of" and "damage to" must have different meanings.  We also observe that while courts across the country, including several state supreme courts, disagree how exactly to define "loss of" and "damage to," they generally agree that the phrases have distinct meanings.[33]

---

[31]     *Loss*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[32]     *Damage*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[33]     *See, e.g.*, *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 553 (Iowa 2022) (recognizing that "physical loss of" property is distinct from "damage to" property even though "a distinct definition of 'loss' must be 'physical' under the Policy language" (quoting *Lisette Enters., Ltd. v. Regent Ins. Co.*, 537 F. Supp. 3d 1038, 1045 (S.D. Iowa 2021))); *Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1274-75 nn.12-13 (Mass. 2022) (noting that physical loss can occur without physical damage in cases of theft or disappearance); *Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. Cnty. Clark*, 535 P.3d 254, 261 (Nev. 2023) (noting that insurance policies in question established "two bases for coverage:  'direct physical loss' as well as 'direct physical damage' "); *Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*, 235 N.E.3d 332, 337-38 (N.Y. 2024) (holding that "physical damage" required "material physical alteration" to property while "direct physical loss" required "an actual, complete dispossession"); *Sullivan Mgmt., LLC v. Fireman's Fund Ins. Co.*, 879 S.E.2d 742, 745 (S.C. 2022) ("Loss connotes destruction, meaning it is broader than the term damage. . . .  [A] property that has suffered physical loss has been damaged, but the converse is not necessarily true because a property can suffer damage without enduring destruction or loss."); *Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 515 P.3d 525, 532 (Wash. 2022) (holding "physical loss" can mean property "physically destroyed" or "deprived of in that the property is no longer physically in . . . possession").

We therefore agree with Baxter and courts across the country in concluding that "direct physical loss" and "direct physical damage" have different meanings.

## 2. "Direct physical loss" requires *some* physical alteration to or deprivation of property.

Baxter argues that loss of use is the inability to use property for its intended purpose and so "direct physical loss" must include loss of use of property due to COVID-19's presence or due to operating restrictions imposed on an insured property by pandemic-related governmental orders. Baxter relies on *Whispering Creek* to bolster its claim that Alaska law supports its interpretation of the phrase "direct physical loss." Zurich responds that "direct physical loss" requires an alteration of property and argues that diminished use of property because of pandemic-related health orders or the presence of COVID-19 cannot constitute direct physical loss. APCIA asserts that allowing coverage for "loss of use" cases would render the word "physical" meaningless.

In *Whispering Creek* we did not focus the phrase "direct physical loss" but instead on the word "collapse." The parties disagreed as to whether the condominiums' condition constituted a collapse and the case law we cited focused on the meaning of "collapse," not "direct physical loss."[34] *Whispering Creek*, therefore, does not provide Baxter with the support it asserts.

While loss may by itself encompass the loss of use, the modifying adjectives "direct" and "physical" narrow its meaning. Black's Law Dictionary defines "direct" as "[f]ree from extraneous influence; immediate";[35] it defines "physical" as

---

[34] 774 P.2d at 178-79.

[35] *Direct*, BLACK'S LAW DICTIONARY (12th ed. 2024); *accord Direct*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016) ("Having no intervening persons, conditions, or agencies; immediate . . . .").

"[o]f, relating to, or involving material things; pertaining to real, tangible objects."[36] "Direct physical loss" therefore must exclude losses that: (1) are not the immediate or closely connected outcome of some "covered cause of loss"; or (2) are intangible or incorporeal.[37]

A mere loss of use without any physical alteration is a classic example of an intangible loss: the loss cannot be perceived by the senses.[38] And, as APCIA suggests, allowing coverage for loss of use of property may result in triggering coverage for any regulation that limits a business's operations to any extent, running contrary to the requirement that the loss be "physical."[39]

We therefore conclude that "direct physical loss" must require *some* physical alteration of property or a deprivation of possession; mere loss of use is insufficient.[40] But since neither the presence of the COVID-19 virus at an insured

---

[36] *Physical*, BLACK'S LAW DICTIONARY (12th ed. 2024); *accord Physical*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016) ("Of or relating to material things . . . .").

[37] *See* 10A JORDAN R. PLITT ET AL., COUCH ON INSURANCE § 148:46 (3d ed. 2023) ("The requirement that the loss be 'physical' . . . is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.").

[38] *See Intangible*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining intangible as "[n]ot capable of being touched; impalpable; incorporeal").

[39] *See, e.g.*, *Plan Check Downtown III, LLC v. AmGuard Ins. Co.*, 485 F. Supp. 3d 1225, 1231-32 (C.D. Cal. 2020) (considering hypotheticals where city changes maximum occupancy codes in restaurants to lower caps or where city amends ordinance to expand duration when restaurants in residential zones must cease operations at night and concluding "loss of use" coverage would be "a sweeping expansion of insurance coverage without any manageable bounds").

[40] The classic example of a loss involving deprivation of possession is theft. *E.g.*, *Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1274-75 nn.12-13 (Mass. 2022).

property nor operating restrictions imposed on an insured property by COVID-19 pandemic-related governmental orders physically altered the property or deprived Baxter of possession, they did not cause "direct physical loss" to the property.

### 3. "Direct physical damage" also requires physical alteration to property.

Baxter acknowledges that "damage to" property requires "physical or tangible harm or injury to covered property" but argues that the presence of the COVID-19 virus caused "physical or tangible harm or injury to covered property." Zurich, joined by APCIA, rejects Baxter's construction of physical damage, arguing that Baxter at best only alleges "temporarily diminished use of property."

The Vermont Supreme Court adopted an approach akin to Baxter's argument in *Huntington Ingalls Industries, Inc. v. Ace American Insurance Co.*[41] In *Huntington*, the court considered an appeal from a grant of judgment on the pleadings in favor of reinsurers on a military shipbuilding company's claims against the reinsurers.[42] The policy at issue insured against "all real and personal property and against all risks of direct physical loss or damage to property."[43] The shipbuilding company sought coverage under the policy for losses it suffered as a result of COVID-19, including losses arising from "disruption in orderly construction and repair of vessels, schedule impacts in the construction and repair of vessels, expenses . . . incurred to continue as near to normal operations as practicable, loss of profit . . . , and other time-element losses."[44] The Vermont Supreme Court reversed the grant of

---

[41]     287 A.3d 515 (Vt. 2022).

[42]     *Id.* at 519-21.

[43]     *Id.* at 520 (alterations and internal quotations omitted).

[44]     *Id.* at 522.

judgment on the pleadings because the shipbuilding company's allegations were "sufficient . . . to survive . . . Vermont's extremely liberal pleading standards."[45]

The court first interpreted "direct physical damage."[46]  It noted that the phrase had "three components":  (1) "immediate or proximate causation"; (2) "material force or effect"; and (3) "injury to property."[47]  It concluded that "direct physical damage" required "a distinct, demonstrable, physical change to property" and held that these could be "alterations at the microscopic level."[48]

The court next explained that the case's procedural posture was "integral" to its decision, because Vermont has "extremely liberal" notice-pleading standards.[49]  It noted that under Vermont law, "[a] complaint need only be a bare bones statement that merely provides the defendant with notice of the claims against it."[50]  As a result it noted that judgments on the pleadings "are disfavored and should be rarely granted."[51]

The court concluded that allegations that COVID-19 "can adhere to surfaces," transform surfaces into "fomite[s],"[52] and therefore "cause[] detrimental physical effects that alter[] and impair[] the functioning of the tangible, material

---

[45]     *Id.* at 537.

[46]     *Id.* at 527.

[47]     *Id.*

[48]     *Id.* at 527-28.  The Supreme Court of Vermont separately concluded that "direct physical loss" requires:  (1) "deprivation or destruction of property"; (2) "in whole or in part"; (3) that is "causally linked to a physical event"; and (4) is "persistent." *Id.* at 529-32.

[49]     *Id.* at 533.

[50]     *Id.* (internal quotation marks omitted).

[51]     *Id.* (internal quotation marks omitted).

[52]     A fomite is "an inanimate object or substance that is capable of transmitting infectious organisms from one individual to another."  *Fomite*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016).

-19-                                                              **7724**

dimensions of the property" was sufficient to constitute "direct physical damage."[53] It emphasized that the insured's allegations that it had to take steps to remedy the situation "by physically altering its property in certain ways, including sanitization procedures, installation of physical barriers and devices, and redesign of physical spaces," "bolster[ed] the argument that a distinct, demonstrable physical alteration occurred and is something that is in need of repair to restore business operations."[54]

The Vermont court "decline[d] to conclude that an event which allegedly causes a physical alteration to property renders property such that it cannot be used as intended, and requires physical remediation efforts targeted at the physical alteration cannot be 'direct physical damage' at th[e] pre-discovery stage."[55] It instead was "inclined to allow experts and evidence to come in to evaluate the validity of insured's novel legal argument before dismissing th[e] case."[56] It emphasized that remanding the case to allow for further factual development was "consistent with the philosophy underlying notice pleading," which aims "not to keep litigants out of court but rather to keep them in so that the merits of the claim may be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial."[57] And it noted that this concern was "paramount for cases involving novel legal theories" like the one before it.[58]

While we agree with the Vermont Supreme Court that the phrase "direct physical damage" requires a physical alteration of property, we depart from its

---

[53]     *Huntington*, 287 A.3d at 533-34 (internal quotation marks omitted).

[54]     *Id.* at 534 (internal quotation marks omitted).

[55]     *Id.* at 534 n.14.

[56]     *Id.* at 535.

[57]     *Id.* (internal quotations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 575 (2007) (Stevens, J., dissenting)).

[58]     *Id.*

conclusion that COVID-19's presence on property constitutes a physical alteration of property. The difficulty with Baxter's argument and the Vermont court's theory is that COVID-19 merely attaches to property; it does not "give rise to the necessary transformative element of something like fire, water, or smoke."[59] Otherwise, as the Nevada Supreme Court noted, "the alleged presence of a physical force would render every sneeze, cough, or even exhale a qualifying harm."[60] And as the Supreme Judicial Court of Massachusetts noted in *Verveine Corp. v. Strathmore Insurance Co.*, "[e]vanescent presence of a harmful airborne substance that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property."[61]

An analogy between the COVID-19 virus and water illustrates this point. COVID-19 is to property what water is to a plastic sheet: water does nothing to a plastic sheet but at most, it stays on it or *attaches* to it. But water *transforms*, *alters*, or *changes* the state of dry paper into a wet "mush" or makes it much easier to tear. COVID-19 merely stays on or attaches to property, as water does to plastic. The virus does to people what water does to paper: it transforms, alters, or changes their well-being, but its effect on people is not at issue here.

We conclude that "direct physical damage" requires physical alteration of property. But because COVID-19 does not physically alter property and merely attaches to it, the presence of COVID-19 on property does not constitute "direct physical damage."

---

[59]     *Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. Cnty. Clark*, 535 P.3d 254, 264 (Nev. 2023) (internal quotations omitted) (quoting *Port Auth. N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002)).

[60]     *Id.* (internal quotations and alterations omitted).

[61]     184 N.E.3d 1266, 1276 (Mass. 2022).

Baxter argues that other provisions of the policy support its interpretation of the phrase "direct physical loss of or damage to" property.  It argues that the phrase includes coverage for loss of use of property due to COVID-19 pandemic-related governmental orders or physical or tangible harm to property caused by the presence of the COVID-19 virus on the property.

Baxter first argues that the Property Coverage for Microorganisms supports its argument, asserting that the coverage insures against "direct physical loss of or damage to Covered Property caused by 'microorganisms,' " and that the word "microorganisms" is defined to include "viruses" like COVID-19.  As a result, it claims, "direct physical loss of or damage to" property specifically envisions the presence of a virus constituting "direct physical loss or damage to" covered property.

Baxter next turns to the policy's Business Income Coverage, which provides coverage for "actual loss of 'business income' [an insured] sustain[s] due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration.' "  It points to the definition of the word 'suspension,' which refers to either a "slowdown or cessation of [an insured's] business activities" or "[t]hat a part or all of the covered location that is rendered untenantable."  Baxter notes that the definition of the "period of restoration" is defined specifically to begin when "[t]he direct physical loss or damage that causes 'suspension' of [an insured's] 'operations' occurs" and to end when "the location where the loss occurred could have been physically capable of resuming the level of 'operations' which existed prior to the loss."  And it excludes "any increased period required due to the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of . . . 'microorganisms.' "  Based on these

-22-

**7724**

definitions, Baxter argues that the policy "expressly envisions a situation where the covered cause of loss was due to . . . viruses."

Baxter next relies on the Civil Authority Coverage for Business Income, which provides coverage for actual loss of business income from the "necessary 'suspension' . . . of [an insured's] 'operations' if the 'suspension' or delay is caused by order of civil authority that prohibits access to the 'premises'." And because "suspension" includes a "slowdown or cessation of [an insured's] business activities" or "part or all of the covered location that is rendered untenantable," Baxter argues that the policy encompasses damages caused by a complete or partial inability to use all of its property due to pandemic-related governmental orders.

Baxter finally argues that the Microorganisms Coverage for Business Income, which provides coverage for "actual loss of 'business income' [an insured] sustain[s] due to the . . . [n]ecessary suspension of [its] operations from direct physical loss of or damage to Covered Property caused by 'microorganisms'," favors its interpretation of "direct physical loss of or damage to."

But Baxter misunderstands or misrepresents policy language in its arguments. First, both the Property Coverage for Microorganisms and Microorganisms Coverage for Business Income provisions require that the microorganisms causing "direct physical loss of or damage to" property be "the *result* of a 'covered cause of loss'," rather than *being* the covered cause of loss.[62] The language of the Microorganisms Exclusion explicitly excludes from coverage "loss or damage consisting of, directly or indirectly caused by, contributed to, or aggravated by the presence, growth, proliferation, spread, or any activity of 'microorganisms', unless resulting from fire or lightning." Thus microorganisms like the COVID-19 virus are

---

[62]    Emphasis added.

excluded from *being* or *causing* a covered cause of loss under the Microorganisms Exclusion.

The Business Income Coverage, which provides coverage for loss of business income as a result of the "suspension" of operations for the "period of restoration," requires that the "suspension" be *caused* by "direct physical loss or damage." But because the Microorganisms Exclusion excludes the COVID-19 virus from being a covered cause of loss, the "suspension" of operations due to the virus is excluded from coverage.

The "period of restoration" provision further confirms that "direct physical loss of or damage to" property requires a physical alteration of property. As Zurich notes, the "period of restoration" extends coverages only until the "location had been restored to the physical size, construction, configuration, location, and material specifications" needed to obtain required permits or similar documents or until "removal, repair, replacement, or restoration of the damaged property is completed."[63] Restoring a location to its original size, construction or configuration, or until "removal, repair, replacement, or restoration" is completed, implies that *some* physical alteration or destruction of the property must take place for "direct physical loss of or damage to" property to have occurred. The presence of COVID-19 virus particles requires no such removal, repair, replacement, or restoration; it either "quickly dissipate[s] on its own," or "can be removed by simple cleaning."[64]

Baxter also selectively quotes the Microorganisms Coverage for Business Income provisions, which provide for coverage only "when the 'microorganisms' are

---

[63]     *See, e.g.*, *Verveine Corp.*, 184 N.E.3d at 1273-75 (relying on "period of restoration" provisions to "bolster[]" interpretation that "direct physical loss of or damage to" requires "some 'distinct, demonstrable, physical alteration of the property' " (quoting 10A JORDAN R. PLITT ET AL., COUCH ON INSURANCE § 148:46 (rev. ed. 2016))).

[64]     *Id.* at 1276.

the *result* of a 'covered cause of loss,' "[65] not when they are the *cause* of loss.  These provisions support the conclusion that the presence of COVID-19 virus particles on property does not constitute "direct physical loss of or damage to" property.

Baxter's argument under the Civil Authority Coverage for Business Income provision also fails because that provision requires an "order of civil authority that prohibits access to the premises."  But Baxter does not allege that DHSS notices and guidance prohibited access to its premises.

None of the provisions of the policy on which Baxter relies support its arguments.  Instead, they make clear that the presence of the COVID-19 virus and pandemic-related operating restrictions imposed on property are excluded from coverage under the policy.

### D.  Case Law Across The Country Supports Excluding The Presence Of COVID-19 Or Pandemic-Related Operating Restrictions From Coverage.

Baxter argues that Alaska's continued adherence to the doctrine of reasonable expectations renders it unique, requiring insurance contracts to be treated differently in Alaska.[66]  It observes that we have never applied our law regarding reasonable expectations to the phrase "direct physical loss of or damage to" and urges us to not to "apply some level of analysis that presents a higher bar to coverage than the law as applied in Alaska."[67]  Zurich responds by reiterating that courts overwhelmingly

---

[65]    Emphasis added.

[66]    *See, e.g.*, Susan Randall, *Freedom of Contract in Insurance*, 14 CONN. INS. L.J. 107, 112 (2008) ("Today only two jurisdictions — Alaska and Hawai'i — accept the doctrine as it was originally formulated, by permitting policyholders' expectations to trump clear policy language.").

[67]    Baxter asserts that the cases it cites that support its position on "direct physical loss of or damage to" property should be given more weight because they apply a higher bar to coverage than Alaska law. *See, e.g.*, *Seifert v. IMT Ins. Co.*, 542 F. Supp. 3d 874, 880 (D. Minn. 2021) (concluding under Minnesota law, "direct

have rejected Baxter's construction of the term "direct physical loss of or damage to." APCIA agrees, arguing that "nationwide authority and common sense dictate that loss of use is neither direct physical loss of nor direct physical damage to property."[68]

As we noted earlier, courts have decided over two thousand COVID-19 business interruption cases and all but one have rejected Baxter's argument.[69] The language "direct physical loss of or damage to" property appears to exclude coverage for the presence of COVID-19 and operating restrictions imposed on the property by pandemic-related governmental orders; other policy provisions bolster this interpretation; and case law across the country overwhelmingly interprets "direct physical loss of or damage to" property to exclude coverage. We therefore conclude that the phrase "direct physical loss of or damage to" property does not encompass either the presence of the COVID-19 virus at an insured property or operating restrictions imposed on an insured property by pandemic-related governmental orders.

## V. CONCLUSION

Neither the presence of the COVID-19 virus at an insured property nor operating restrictions imposed on an insured property by pandemic-related

---

physical loss" can occur "without structural damage or tangible injury to property," but merely "an impairment of function and value" to property) (internal quotation marks omitted); *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, 522 F. Supp. 3d 457, 463 (N.D. Ill. 2021) (finding insured dental practice stated viable COVID-19 business interruption claims for coverage under property insurance policy because "physical loss is broad enough to cover . . . a deprivation of the use of its business premises") (internal quotation marks omitted); *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*, 489 F. Supp. 3d 1297, 1302-03 (M.D. Fla. 2020) (denying insurer's motion to dismiss because virus exclusion did not unambiguously exclude coverage for COVID-19 business interruption losses); *Huntington Ingalls Indus. v. Ace Am. Ins. Co.*, 287 A.3d 515, 524-533 (Vt. 2022).

[68]  Capitalization and emphasis omitted.

[69]  *See supra* notes 13-15 and accompanying text.

governmental orders constitutes "direct physical loss of or damage to" the property for the purposes of a commercial insurance policy.

# In the Supreme Court of the State of Alaska

**Baxter Senior Living, LLC,**
                    Plaintiff,

v.

**Zurich American Insurance Co.,**
                    Defendant.

U.S. District Court No. **3:22-CV-00044-SLG**

Supreme Court No. **S-18541**

## Order Regarding
## Fees and Costs

Date of Order: **9/27/2024**

       Each party is to bear its own costs and attorney's fees in the supreme court in this matter.

       Entered at the direction of an individual justice.

Clerk of the Appellate Courts

Mackenzie Jisa, Deputy Clerk

Distribution:

Email:
Bankston, William M.
Adler, Suzanne April
O'Sullivan, Erika
Baylous, Michael Bruce
Schoeggl, David M.
Hofer, Patrick
Clapper, Jared
Findley, Matthew T.